# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

DERRICK WILSON,

        **Plaintiff,**

 v.                             **Case No. 20-CV-699**

FAWN SCHWANDT, RODOLFO ALVARADO,
CHRISTOPHER SCHLACHTER, WILLIAM SHEEHAN,
ANNE PORTNOY, PAUL BJORKQUIST,
MICHAEL ALLES, and WARREN ALLEN,

        **Defendants.**

---

## DECISION AND ORDER

---

Plaintiff Derrick Wilson, who is representing himself and confined at Racine Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. Wilson was allowed to proceed on the following claims: a claim under the Fourth Amendment against Detective Anne Portnoy, Detective Fawn Schwandt, Lieutenant Paul Bjorkquist, and Captain Warren Allen for effectuating his seizure using false information; a claim under the Fourth Amendment against Detective Rodolfo Alvarado and Detective Christopher Schlachter for searching his home without a warrant or consent; a claim under both the Fifth and Fourteenth Amendments against Alvarado and Schlachter for interrogating Wilson without an attorney present; and a claim under the Fourth Amendment against Lieutenant William Sheehan and Detective Michael Alles for coercing Wilson into allowing them to search his cellphone.

On November 6, 2021, the defendants moved for summary judgment. (ECF No. 53.) After the defendants filed their motion, the court allowed Wilson to replace a John Doe defendant placeholder with Bjorkquist (ECF No. 73), and the defendants moved to amend their summary judgment motion (ECF No. 77). Rather than have the defendants file an amended motion for summary judgment, the court denied without prejudice the defendants' motion for summary judgment and gave them leave to refile their summary judgment motion. (ECF No. 78.) On February 8, 2022, the defendants filed their second motion for summary judgment. (ECF No. 79.) That motion is fully briefed and ready for a decision. The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 4, 17.)

## FACTS

*Parties*

Plaintiff Derrick Wilson was arrested and subsequently convicted for an armed robbery that occurred on June 14, 2017. (ECF No. 105, ¶¶ 1-2.) All of the defendants were employed by the City of Milwaukee Police department during the course of the relevant events and played some role in the investigation of the June 14 armed robbery. Defendants Anne Portnoy, Fawn Schwandt, Christopher Schlachter, Rodolfo Alvarado, William Sheehan, and Michael Alles were detectives. (*Id.*, ¶¶ 3, 5, 7-10.) Defendant Warren Allen was a Captain, and defendant Paul Bjorkquist, currently a lieutenant, was a sergeant at the time of the armed robbery. (*Id.*, ¶¶ 4, 6.)

Case 1:20-cv-00699-WED   Filed 08/11/22   Page 2 of 26   Document 109

*Issuance of the Temporary Felony Warrant and Probation Hold*

On June 14, 2017, an armed robbery occurred at the American Inn Motel located at 6798 West Appleton Avenue in Milwaukee, Wisconsin. (ECF No. 10, ¶ 21.) Unnamed police officers (who are not defendants) arrived at the scene to investigate. (*Id.*, ¶ 23.) During their investigation, which occurred over the course of two days, the officers interviewed the victim, who was the main witness, and collected evidence from the hotel room that the suspect allegedly stayed in, Room 215. (*Id.*, ¶¶ 23- 24; ECF No. 104-2, ¶ 2.) The victim stated that the suspect was the only one in and out of Room 215 that day. (*Id.*) He also described the suspect as a man in his late thirties to early forties. (*Id.*, ¶ 33.) Wilson states that surveillance video footage retrieved by non-defendant Detective McClendon shows that there were two individuals who entered and left Room 215 that day. (*Id.*) However, Wilson did not provide the footage to the court.

According to Wilson, McClendon was in charge of the investigation of the crime scene and ordered Forensics Investigator Muhammad (also not a defendant) to "process" Room 215. (ECF No. 104-2, ¶ 2.) Muhammad reported recovering four latent fingerprints. (*Id.*) Wilson states that non-defendant Examiner Jacobs decided to discard these prints on June 15, 2017, and no other investigators or detectives questioned why or had the prints analyzed. (*Id.*, ¶ 3.) However, Wilson does not explain his basis for this assertion.

Wilson also states that McClendon collected a plastic garbage bag which contained two fingerprints. (ECF No. 104, ¶ 25.) According to Wilson, when the

3

Milwaukee Police Department Forensics lab analyzed the plastic garbage bag for fingerprints, they only processed one of the two prints on the bag. (*Id.*, ¶ 25.) The basis for Wilson's assertion is unclear. Regardless, it is undisputed that one fingerprint was identified as Wilson's. (*Id.*, ¶ 25.)

On June 16, 2017, at approximately 9:50 a.m., Captain Allen received an email informing him that Wilson's fingerprint was found at the crime scene. (ECF No. 105, ¶ 26.) Allen states he asked Detective Portnoy to review the data surrounding the fingerprint and run a background check on Wilson. (*Id.*, ¶ 27.) Wilson states that Allen was the one who ran the background check on him and discovered that Wilson was on probation. (*Id.*) Allen then "suddenly believed that Wilson was the criminal suspect and that his physical description matched the description of the suspect as described by the victim. It was only after this determination, without any further investigation whatsoever, that Capt. Allen personally contacted Det. Portnoy." (*Id.*) While Wilson is correct that Allen, in his declaration, states that he ran Wilson's criminal history in Teletype prior to delegating the investigation to Portnoy (contradicting the defendants' proposed findings of fact), Wilson does not explain the basis for his statement that Allen "suddenly believed" that Wilson was the suspect. (ECF No. 86, ¶¶ 6-8.)

It is undisputed that Portnoy used the Teletype database to conduct her investigation. (ECF No. 105, ¶ 28.) The Teletype database "is a law enforcement communications network that scans for outstanding warrants, parole and other suspect information on any identified suspect in a criminal investigation." (*Id.*, ¶ 14.) Portnoy also reviewed official reports and other search archives available to her and

4

determined that Wilson was on probation under the custody of the Wisconsin Division of Community Corrections (DOCC), having been convicted of a previous armed robbery similar in nature to the June 14 armed robbery. (*Id.*, ¶ 29.) As a result, Portnoy believed that Wilson was in violation of his probation terms. (*Id.*, ¶ 30.) Portnoy attempted to reach Wilson's probation agent, and the cover agent of record (a cover agent is the agent who covers the investigation of a probation violation), and when both were unavailable Portnoy left each of them a voicemail. (*Id.*)

Portnoy then issued a Temporary Felony Want and Suspect Alert (TFW)[1], which "is an interdepartmental memo stating that law enforcement has found there is probable cause to arrest a suspect for a temporary period of time for suspected criminal acts." (ECF No. 105, ¶¶ 16, 31.) On the TFW for Wilson, setting forth probable cause for his arrest, Portnoy wrote:

> On 6/14/17, an armed robbery took place at the American Inn Hotel at 6798 W. Appleton Ave in the city and county of Milwaukee. The victim/hotel employee identified the actor as the subject that was staying in Room 215. Room 215 was processed and all items left behind by the suspect were checked for prints. A latent hit on a plastic garbage bag was identified as the above listed actor [Wilson], who was the only person in and out of the room during the stay. Wilson's physical description matches that

---

[1] In his brief in opposition (ECF No. 104-1) and in his response to the defendants proposed findings of facts (ECF No. 105), Wilson repeatedly argues that the Milwaukee Police Department's practice of using TFWs to effectuate seizures is illegal and therefore his seizure is unconstitutional. The court has already addressed this argument in its January 19, 2022, order denying Wilson's motion to amend/correct his complaint. (ECF No. 75.) The court determined that the TFW operates more like an "all-points bulletin," letting other officers within a network know that one of their fellow officers believes he has probable cause and requests that they detain a suspect if they encounter him. It does not replace the requirement that an officer must make a finding of probable cause.

of the suspect as related by the victim. Obtained was $1000 in US currency. Suspect was armed with a chrome handgun.

(ECF No. 81-3 at 2.)

Wilson asserts that Portnoy intentionally omitted the information about the four fingerprints that Muhammad recovered and the additional print on the garbage bag. (ECF No. 104, ¶ 33.) He also states that she falsely reported that he was the only one in and out of Room 215 despite the fact that the surveillance video showed two men entering and leaving Room 215. (*Id.*) Wilson further asserts that Portnoy falsely claimed that he met the physical description given by the victim that described the suspect as "late thirties to early forties" because Wilson was 28 at the time of his arrest. (*Id.*) Portnoy states that she did not fabricate or falsify any detail when writing her probable cause statement. (*Id.*, ¶ 33.)

Captain Allen, Portnoy's supervisor, reviewed her TFW, including the probable cause statement. (ECF No. 105, ¶ 35.) He determined "that it was an accurate representation of the facts, data, evidence, statements, and fingerprint match." (*Id.*) He then signed off on issuing the TFW. (*Id.*, ¶ 35.) Wilson states that Allen had "a legitimate reason to be suspicious as to MPD having probable cause to arrest Wilson" and therefore had an obligation to do further investigation. (*Id.*)

On June 17, 2017, Detective Schwandt received the TFW and arrested Wilson in front of his mother's home. (ECF No. 105, ¶ 39.) Schwandt states that she reviewed the police reports, the victim statements, the descriptions, the fingerprint analysis, in addition to the TFW, and reasonably believed she had sufficient probable cause to arrest Wilson. (ECF No. 86. ¶ 5.) Wilson states that Schwandt arrested him based off

6

of a warrant issued by Portnoy, and that the warrant was "not supported by oath or affirmation." (ECF No. 105, ¶ 39.) Wilson contends that, because the warrant lacked probable cause, his arrest was unlawful. (*Id.*) It appears that Wilson considers the TFW an arrest warrant. Confusingly, Wilson later contends his arrest was warrantless. (*Id.*, ¶ 43.) The defendants also characterize the arrest as warrantless. (*Id.*, ¶ 41.)

After Wilson's arrest, Detective Schwandt filled out Milwaukee Police Department form PA-45, which indicates that she had probable cause to arrest Wilson without a warrant, and form CR-215, which applied for a judicial determination to establish probable cause, allowing Wilson to be held longer than 48 hours. (ECF No. 105, ¶ 41.) For her probable cause statement, Schwandt wrote the following:

> On Wednesday, 6-14-17, an armed robbery took place at the American Inn Hotel, located at 6798 W. Appleton Ave in the city and county of Milwaukee. The suspect in the offense was armed with a chrome handgun and obtained $1000 in US currency. The victim/hotel employee identified the actor as the subject that was staying in room 215 at the hotel. A forensic investigator processed room 215 and all of the items left behind by the suspect were checked for fingerprints. A latent hit on a plastic garbage bag was identified as the right thumbprint of Derrick M. Wilson (b/m, 6-20-88). WILSON was the only person in and out of the room during the stay. WILSON's physical description matches that of the suspect as related by the victim.

(ECF No. 20 at 30.)

Wilson states that Schwandt intentionally omitted reference to the other five fingerprints found in Room 215 and falsely swore that Wilson matched the physical description provided by the victim. (ECF No. 105, ¶ 50.) Wilson again points out that the victim described the suspect as a man in his late thirties to early forties and that

7

he was only 28 at the time of arrest. (*Id.*) Schwandt states she did not intentionally provide false information on the probable cause statement and that she substantially copied the probable cause statement from Portnoy's TFW. (*Id.*, ¶¶ 40, 48.)

Schwandt had her supervisor, Lieutenant (then Sergeant) Bjorkquist, review and notarize her form PA-45 and form CR-125. (*Id.*, ¶ 43.) Bjorkquist believed the information contained on both forms was accurate based on the official records and evidence. (*Id.*, ¶ 50.)

On June 17, at approximately 8:00 PM, Detective Schwandt called and notified the DOCC that Wilson had been arrested on suspicion of armed robbery. (ECF No. 105, ¶ 43.) The DOCC, which is not related or connected to the Milwaukee Police Department, issued a probation hold on Wilson, which provided the Milwaukee Police Department with the authority to hold Wilson for a potential probation violation. (*Id.*, ¶ 45.) Schwandt states she did not provide a statement or file any document with the DOCC. (*Id.*, ¶ 47.) Wilson asserts that a "Law Enforcement Contact Sheet" is created whenever a police officer contacts the DOCC to report a probation violation and the statement given by the officer is a sworn statement. (*Id.*, ¶ 49.) He cites "Pl. Ex. 07" as a foundation for this assertion, but there is no "Pl. Ex. 07" in the record. (*Id.*) Wilson also does not summarize the content of the sworn statement allegedly contained in the Law Enforcement Contact Sheet. Because the DOCC placed a probation hold on Wilson, Schwandt no longer needed to obtain a probable cause determination through the CR-215. (*Id.*, ¶ 51.)

*Wilson's Interrogation*

Wilson was then taken to a temporary holding facility where Detectives Schlachter and Alvarado interrogated him. (ECF No. 105, ¶ 57.) Schlachter and Alvarado first interrogated him on June 17, 2017. (*Id.*, ¶ 52.) It is undisputed that Schlachter read Wilson his *Miranda* rights at the beginning of the interrogation and that Wilson waived them. (*Id.*, ¶ 53.) As shown on the video of the interrogation, Wilson was eager to waive his rights and "get to the basics" of the questioning. (ECF No. 81-6 at 3:13-4:01.) After approximately 90 minutes of questioning, the interrogation wound down. (*Id.*, ¶ 1:25:00-1:27:00.) Wilson reviewed a form authorizing a search of his residence and stated he had concerns with certain conditions contained in the form. (*Id.*) He asked whether he would be interrogated over the course of the next two-to-three days, to which Alvarado responded that it was possible. (*Id.*) At that point, Wilson informed Schlachter and Alvarado that he would not answer any more questions or participate in any more interrogations without an attorney present. (*Id.*) The interrogation then ended. (*Id.*)

After the interrogation, which ended around 12:50 a.m. on June 18, Wilson states he was taken to a "barren room" where the cot lacked sheets or blankets. (ECF No. 104-2, ¶ 21; ECF No. 105, ¶ 54.) The faucet also did not work, and the cell was cold. (ECF No. 104-2, ¶ 21.) When Wilson complained about the conditions of the cell, holding facility staff either ignored him or told him he would be leaving the holding facility soon. (*Id.*, ¶ 22.) Wilson had not eaten since before his arrest and was not given breakfast or lunch on June 18. (*Id.*, ¶¶ 23-24.) Later that day, when Lieutenant

9

Sheehan stopped by Wilson's holding cell, Wilson told him he was cold and hungry. (*Id.*, ¶¶ 27-28). According to Wilson, Sheehan told him that he "had to recant my Miranda rights and come back to the table in order to get any help; otherwise, he could not help me because I had asked for a lawyer." (*Id.*, ¶ 29.) At that point, as discussed in the section below, Wilson agreed to give a DNA sample and allow Sheehan to search his cellphone. (*Id.*, ¶ 30.) The faucet in Wilson's cell was then turned on and Wilson was given McDonald's to eat. (*Id.*)

On June 19, 2017, Wilson told Detective Schlachter that he was "starving and cold and tired and that I wanted to be released." ((ECF No. 104-2, ¶ 32.) Schlachter was indifferent to Wilson's complaints and "insisted that I had to cooperate with investigators." (*Id.*) Wilson also states that Schlachter would "constantly badger[]" him about being interrogated again. (ECF No. 105, ¶ 57.) In order to be fed and improve the conditions of his confinement, Wilson agreed to be interrogated by Detectives Schlachter and Alvarado again. (*Id.*, ¶ 60.)

Video of the June 19, 2017, interrogation shows that Schlachter and Alvarado asked Wilson if he asked another unnamed detective if he could speak with them again, and Wilson confirmed that he did. (ECF No. 81-7 at 17:30.) Schlachter then reminded Wilson that the last time they spoke Wilson was adamant about not speaking to them again without an attorney present, to which Wilson responded, "I recant that. I changed my mind on that. I am trying to cooperate with you guys." (*Id.*, at 18:30.) Schlachter asked if anyone made any threats or promises to get him to cooperate, to which Wilson responded that he was there on his own free will and

10

wanted to cooperate. (*Id.*) Schlachter again read Wilson is *Miranda* rights, and Wilson again waived them. (*Id.* at 18:48-19:48.) It is undisputed that in both the June 17 and June 19 interrogations Wilson did not confess to either the June 14 robbery or any other crime. (ECF No. 105, ¶ 63.) There is also no evidence on the record that any of the statements Wilson made in either interrogation were used against him at any point in his criminal proceedings.

*Search of Wilson's House*

During the June 17 interrogation Wilson clearly stated that he did not consent to anyone "going through his stuff" and refused to sign the consent form. (ECF No. 81-6 at 1:24:00). The next day, Schlachter and Alvarado visited the home of Wilson's mother, Denise Freeman, who was residing at 8022 West Keefe Avenue in Milwaukee. (ECF No. 105, ¶¶ 64, 68.) Schlachter and Alvarado confirmed that Freeman owned the home. (*Id.*, ¶ 67.) Schlachter and Alvarado asked if Wilson lived there and paid rent. (*Id.*, ¶ 65.) The defendants assert that Freeman responded that Wilson was living there and did not pay rent. (*Id.*)

Wilson states that Freeman told Detectives Schlachter and Alvarado that Wilson lived in a room in the basement and paid "$100 week in rent to help out." ECF No. 105, ¶ 65.) It is undisputed that Freeman told Schlachter and Alvarado that she had unfettered access to Wilson's room and often picked up his dirty laundry. (*Id.*, ¶ 66.) Freeman provided Schlachter and Alvarado written consent to search Wilson's room without a search warrant. (*Id.*, ¶¶ 67-68.) Wilson notes Freeman signed the same form he refused to sign during the June 17 interrogation. (*Id.*, ¶ 68.) The defendants

11

note that during Wilson's criminal trial Freeman never testified or otherwise stated that Wilson paid rent or that she had anything less than unfettered access to his basement bedroom. (*Id.*, ¶ 70.)

*Search of Wilson's Cellphone*

On June 18, 2017, at approximately 3:00 p.m., Lieutenant Sheehan visited Wilson's holding cell. (ECF No. 105, ¶ 71.) Wilson states he told Sheehan he hadn't eaten in several hours and that his faucet did not work. (*Id.*) According to Wilson, Sheehan "explained to Wilson that he had to cooperate if he expected anyone to help him in return." (*Id.*) Wilson also states that Sheehan would visit his cell to "badger" him. (*Id.*, ¶ 74.)

Around 3:24 p.m., Wilson agreed to allow Sheehan and Detective Alles to search his cellphone and take a DNA sample. (ECF No. 105, ¶ 71.) Wilson spent 50 minutes with Sheehan and Alles. (*Id.*, ¶ 74.) Sheehan and Alles state that they did not interrogate Wilson or ask any questions that would lead to Wilson making incriminating statements. (*Id.*, ¶¶ 72-73.) They also assert that, during the interview, Wilson did not tell them he was hungry, that his faucet wasn't working, or that his cell conditions were poor. (*Id.*, ¶ 74.) Wilson acknowledges that he consented to the search of his cellphone, but he denies that he did not tell Sheehan and Alles about the conditions of his cell and that he was hungry. (*Id.,* ¶ 77.) He further states that Sheehan coerced him into allowing the search of his cellphone and to give a DNA sample by promising improved cell conditions and food, and Alles knew that Sheehan

12

was violating Wilson's rights by coercing these searches but did nothing to intervene. (*Id.*, ¶¶ 77-78.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'"

13

*Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

*Fourth Amendment Claim Against Portnoy, Allen, Schwandt, and Bjorkquist*

Wilson claims that Detective Portnoy violated his Fourth Amendment rights when she issued a TFW with false information. He also claims that Detective Schwandt violated his Fourth Amendment rights when she arrested him based off the TFW with false information and then made sworn statements with false information in form CR-125 and to the DOCC in order to have a probation hold placed. He contends Captain Allen and Lieutenant Bjorkquist, as Portnoy's and Schwandt's supervisors, respectively, knew that Portnoy and Schwandt had issued probable cause statements containing false information.

"Generally, citizens enjoy the right not to be seized or arrested absent probable cause." *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003). However, people on probation may be searched or seized "on the basis of 'reasonable suspicion' that they violated the terms of their supervision." *Smith v. City of Madison*, 413 F.Supp.3d 823, 841 (W.D. Wis., 2019) (quoting *U.S. v. Knights*, 534 U.S. 112, 121 (2001)). "A reasonable suspicion requires 'more than a hunch but less than probable cause. . . . Determining whether an officer had reasonable suspicion is assessed considering 'the totality of the circumstances,' and 'common-sensical judgments and inferences about human behavior.'" *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (quoting *Jewett v.*

14

*Anders*, 521 F.3d 818, 823-25 (7th Cir. 2008); *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005)).

Both Portnoy and Schwandt learned that Wilson was on probation at the time of the armed robbery. Thus, Portnoy, in issuing the TFW, and Schwandt, in arresting Wilson, needed only reasonable suspicion that Wilson had violated the terms of his probation by committing the armed robbery in question. They did not need probable cause that he had done so.

Taking the facts in the light most favorable to Wilson, both Portnoy and Schwandt had reasonable suspicion to believe that Wilson had violated the terms of his probation by committing the armed robbery in question. Wilson's main argument is that both Portnoy and Schwandt used false information in issuing the TFW and in justifying Wilson's arrest. False information could invalidate a TFW or an arrest where the defendants "knowingly or intentionally or with a reckless disregard for the truth made false statements" that created the basis for the reasonable suspicion. *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 742-43 (7th Cir. 2003); *see also Smith*, 413 F.Supp.3d at 841 (applying *Beauchamp* to the question of whether the defendant had reasonable suspicion). "A 'reckless disregard for the truth' is demonstrated by showing that the officers entertained serious doubts as to the truth of their statements, had obvious reasons to doubt the accuracy of the information reported," or failed to divulge that they knew information that would negate a reasonable suspicion or probable cause. *Beauchamp*, 320 F.3d at 743.

15

Wilson contends that Portnoy's TFW contained three false statements that would invalidate her reasonable suspicion. First, in an effort to falsely identify him as the suspect in the armed robbery, Portnoy intentionally omitted from the TFW any mention of the other five fingerprints found in Room 215. However, Wilson assumes that the other five fingerprints were exculpatory—that is, that they were not his. But nothing in the record establishes that the fingerprints were not his or that they were even in a condition to be processed and run through the databases to determine whose fingerprints they were. Though Wilson asserts that Examiner Jacobs decided to discard four of the prints, he offers no evidence explaining the basis for saying so. Bald assertions that are not supported by more specific evidence are insufficient to create a genuine issue of material fact. *Drake v. Minn Mining & Mfg Co.*, 134 F.3d 878, 887 (7th Cir. 1998). In any event, it is undisputed that one of the fingerprints found in the room was Wilson's. That print alone provided both Portnoy and Schwandt with reasonable suspicion to believe that Wilson had violated the terms of his probation by committing the armed robbery.

The second piece of information in Portnoy's TRW that Wilson argues was false is the statement that he was the only person seen entering and leaving Room 215. He contends that the surveillance video collected by McClendon shows two men entering and leaving Room 215. Although he cites the video footage in his response to the defendants' proposed findings of fact, Wilson did not submit the video into evidence. (ECF No. 105, ¶ 33.) Without the video, the court cannot verify that it shows two men entering and leaving Room 215. However, even if it did, and Portnoy either did not

16

review the video or made a mistake in her statement, she still had reasonable suspicion that Wilson had violated the terms of his probation. The omission of facts or mistakes do not amount to a reckless disregard for the truth where a probable cause or reasonable suspicion finding is still supported, and it appears that the mistakes or omissions were a result of negligence or of a hasty investigation. *U.S. v. Williams,* 718 F.3d 644 (7th Cir. 2013); *Helen v. North Carolina*, 574 u>S. 54, 60 (2014) (holding that where an officer makes a mistake, as long as the mistake are "those of reasonable men", the finding of reasonable suspicion still stands.).

Finally, Wilson asserts that Portnoy falsely stated that he matched the description of the suspect. He points out that he was only 28 when the armed robbery occurred but the victim described the suspect as a man in his late thirties to early forties. Wilson assumes that the description of the suspect that Portnoy referenced was limited to just his age. However, McClendon's police report, which Wilson acknowledges formed the basis of Portnoy's TFW statement, contains additional details identifying the suspect, including that he had "painted on facial hair," was a black male, medium complexion, and medium build. (ECF No. 81-1 at 6-7; ECF No. 105, ¶ 33; ECF No.84, ¶ 5; ECF No. 86, ¶ 5.) That the description was slightly off on age does not mean that Wilson did not otherwise match the physical description in Portnoy's TFW.

None of the allegedly false statements identified by Wilson demonstrate that Portnoy's TFW was constitutionally impermissible. Portnoy did not violate Wilson's Fourth Amendment rights in issuing the TFW. Additionally, because Portnoy's TFW is

constitutionally valid, Schwandt's arrest, based largely on Portnoy's TFW, was also constitutionally valid.

Wilson states that Schwandt also made false statements to the DOCC in the Law Enforcement Contact Sheet. However, he provided no evidence of what was said in that sheet. The court cannot determine the truthfulness or accuracy of Schwandt's DOOC statement or use it to find that Schwandt did not have reasonable suspicion that Wilson violated his probation. No reasonable jury could conclude that Schwandt violated Wilson's Fourth Amendment rights in arresting him or in contacting the DOCC.

If neither Portnoy nor Schwandt committed a constitutional violation, Wilson's claims against their supervisors, Allen and Bjorkquist, also cannot stand. *See Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (holding that where this no constitutional violation, there is nothing for supervisors to condone or turn a blind eye to). Thus, summary judgment on Wilson's Fourth Amendment seizure claim is granted in favor of Portnoy, Schwandt, Allen, and Bjorkquist. Because there are no other claims against these defendants, they are dismissed.

*Fifth Amendment Claim Against Schlachter and Alvarado*

Initially Wilson alleged in his amended complaint that, although he demanded an attorney several times during both interrogations, Detectives Schlachter and Alvarado refused to provide him one. The court allowed him to proceed on a Fifth Amendment claim on that basis. However, the video evidence clearly shows that

18

Wilson waived his *Miranda* rights on June 17 willingly and that, once he demanded an attorney, the interrogation ended.

Thus, Wilson's claim is narrowed to whether Schlachter and Alvarado violated his Fifth Amendment right against self-incrimination when they interrogated him on June 19, 2017, without an attorney present. "Once an accused is read his *Miranda* rights, he may invoke his right to counsel under the Fifth and Fourteenth Amendments by requesting an attorney, and the police must immediately cease the interrogation until counsel is present." *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). Waivers of the *Miranda* rights "must be voluntary, knowing, and intelligent." *Id.* "To be voluntary, the waiver must simply be non-coerced; to be knowing and intelligent, waiver must be made with 'a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

Wilson asserts that, by being subjected to poor holding cell conditions, denied food, and repeatedly badgered by Detective Schlachter, he was coerced into waiving his *Miranda* rights for the June 19 interrogation. Schlachter and Alvarado argue that the video of the interrogation unequivocally demonstrates that Wilson voluntarily, knowingly, and intelligently waived his *Miranda* rights. Schlachter explicitly asked Wilson if he was threatened or promised anything in order to waive his rights, to which Wilson answered "no."

A question of fact exists as to whether Wilson's waiver of *Miranda* rights for the June 19 interrogation was coerced. The video does not "blatantly contradict" Wilson's

statement that he was coerced into waiving his *Miranda* rights in the second interrogation through the deprivation of food, uncomfortable cell, and harassment by Schlachter and other officers. Thus, the court cannot say that no reasonable jury could believe that he was coerced into waiving his *Miranda* rights for the second interrogation. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

However, this question of fact is not material because, as a matter of law, Wilson does not have a claim under § 1983. A plaintiff may not bring a claim under § 1983 for a Fifth Amendment violation where "his compelled statements had not been used against him in a criminal case." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1024 (7th Cir. 2006) (discussing *Chavez v. Martinez*, 538 U.S. 760 (2003)). Mere questioning by the police does not constitute "use" in a criminal case for Fifth Amendment purposes. *Id.* at 1025. To recover damages, the plaintiff's ill-gained statements must be used in a way that qualifies as a "courtroom use," including at preliminary hearings, to find probable cause, or to set bail. *Id.* at 1027.

Here, it is undisputed that the June 19 interrogation did not result in any sort of confession from Wilson. Nor does Wilson present any evidence that any statements he made in the June 19 interrogation were otherwise used in his criminal proceedings. Thus, based on the evidence available, no reasonable jury could conclude that the statements Schlachter and Alvarado elicited on June 19 violated the Fifth Amendment. As such, summary judgment on this claim is granted in their favor.

*Fourth Amendment Unreasonable Search Claim Against Schlachter and Alvarado*

Wilson also claims that Detectives Schlachter and Alvarado violated his Fourth Amendment rights when they conducted a warrantless search of his home. "While the Fourth Amendment protects against unreasonable searches and seizures, warrantless searches are *per se* unreasonable." *U.S. V. Grap*, 403 F.3d 439, 443 (7th Cir. 2005). However, warrantless searches "are constitutional under the Fourth Amendment if 'an authorized individual voluntarily consents to the search.'" *Id.* (quoting *U.S. v. Duran*, 957 F.2d 499, 501 (7th Cir. 1992)). "A third party cannot consent to a search of another's home unless the third party possesses common authority over, or other sufficient relationship to, the premises." *U.S. v. Jackson*, 910 F. Supp. 2d 1146, 1150 (E.D. Wis. 2012) (citing *U.S. v. Ryerson,* 545 F.3d 483, 488 (7th Cir. 2008)).

Either actual or apparent authority is sufficient to provide consent to a search. *U.S. v. Chaidez*, 919 F.2d 1193, 1201 (7th Cir. 1990). To determine actual authority, there must be "mutual use of the property by persons generally having joint access or control for most purposes." *Ryerson*, 545 F.3d at 487. Apparent authority to consent to a search exists "when the facts available to an officer at the time of the search would allow a person of reasonable caution to believe that the consenting party had authority over the premises." *Id.* at 489.

Because it is undisputed that Freeman owned the home where Wilson lived and had unfettered access to Wilson's bedroom, she had actual and apparent authority to consent to the search of the home, including Wilson's bedroom. While Wilson may have been giving his mother money every week for living expenses, even his own

21

characterization of the financial relationship—to "help out"—suggests that the financial arrangement did not come with the expectation of privacy in Wilson's living quarters. *See U.S. v. Hernandez*, Case No. 14-cr-242, 2016 WL 1627729 at *3 (S.D. Ind. Apr. 19, 2016) (discussing *U.S. v. Whitfield*, 939 F.2d 1071 (D.C. Cir 1991 and *U.S. v. Ladell*, 127 F.3d 622 (7th Cir. 1997), to find that, where an adult child does not pay rent, he does not have a greater privacy interest in his bedroom and his parent had common authority and ability to consent to the search.) Because Freeman had joint access and control over the basement bedroom, no reasonable jury could conclude that she lacked authority to consent to a search of her home, including the bedroom where Wilson stayed. Summary judgment is granted in favor of Schlachter and Alvarado. Because there are no additional claims against them, they are dismissed.

*Fourth Amendment Unreasonable Search Claim Against Sheehan and Alles*

Wilson claims that Lieutenant Sheehan and Detective Alles violated his rights when they coerced him into consenting to a search of his cellphone[2] by withholding food, water, and appropriate cell conditions. "The Fourth Amendment requires that 'consent not be coerced, by explicit or implicit means, by implied threat or covert force.'" *U.S. v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). "The voluntariness of consent is a question of fact informed by the totality of the circumstances." *Id.* The court should consider the following relevant factors when determining whether consent was coerced: "(1) the

_____

[2] In his amended complaint, Wilson limited his allegations to his cellphone search and did not discuss obtaining his DNA. As such, he was allowed to proceed on a claim only regarding the cellphone search.

22

age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether he was in custody when he consented." *Id.*

Taking the facts in the light most favorable to Wilson, after stating that he would not answer any additional questions without the presence of an attorney, he went several hours without being given anything to eat and was in an uncomfortable holding cell. In addition, Detective Sheehan came to him several times to "badger him" about cooperating. (ECF No. 105, ¶ 74.) At one point, Wilson told Sheehan he was hungry and didn't have running water. Sheehan implied that, if Wilson cooperated, he would receive food and running water. Wilson felt that he had to agree to be interrogated again and cooperate in order to improve his situation.

The defendants dispute that Wilson ever told Sheehan or Alles he was hungry or did not have running water or otherwise complained about the conditions of his confinement. The defendants also state that video footage clearly shows Wilson telling Schlachter and Alvarado that "neither Dets. Sheehan nor Alles threatened, intimidated or coerced him into obtaining his consent to search his cellphone and DNA." (ECF No. 80 at 21.) The defendants cite a transcript of the June 19 interrogation as proof that Sheehan and Alles did not coerce Wilson. The transcript, however, reflects that Wilson was asked whether anyone coerced him into agreeing to talk to Detectives Schlachter and Alvarado again, not whether Wilson agreed to a search of his cellphone. (ECF No. 81-10.) In short, the video does not unequivocally

23

demonstrate the absence of a genuine factual dispute, nor does it blatantly contradict Wilson's allegations that he was coerced into agreeing to have his cellphone searched.

Considering the totality of the circumstances, a reasonable jury could conclude that Sheehan and Alles coerced Wilson to agree to the search of his cellphone by withholding food, water, and adequate cell conditions. Thus, there is a genuine issue of material fact as to whether Sheehan and Alles coerced Wilson into consenting to a search of his cellphone. And, unlike the June 19 interrogation, where the record is clear that the government made no use of anything learned during the interrogation, nothing in the record informs the court whether anything recovered from Wilson's cellphone was used against him in any way. Thus, the court cannot conclude that Wilson does not state a claim for damages based on the search of his cell phone on the grounds that the government made no use of information recovered from the phone.

Sheehan and Alles argue that, even if the court finds that a genuine question of material fact exists, summary judgment should be granted in their favor because they are entitled to qualified immunity. To determine whether qualified immunity applies, the court must consider "(1) whether the defendants violated a constitutional right, and (2) whether the constitutional right was clearly established." *Broadfield v. McGrath*, 737 Fed. Appx. 773, 775 (7th Cir. 2018).

As discussed above, the court has already determined that a reasonable factfinder could conclude that Sheehan and Alles violated Wilson's Fourth Amendment rights by coercing him into consenting to a search of his cellphone. The only question remaining is whether the rights Sheehan and Alles may have violated were clearly

24

established. It has long been established that an officer cannot conduct warrantless searches when the totality of the circumstances demonstrate that consent had not been voluntarily given. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Sheehan and Alles are not entitled to qualified immunity. Summary judgment on the claim against them is denied.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted in part and denied in part. The court grants summary judgment on the Fourth Amendment claims against Portnoy, Schwandt, Allen, and Bjorkquist. The court also grants summary judgment on the Fourth, Fifth and Fourteenth Amendment claims against Schlachter and Alvarado. The court denies summary judgment on the Fourth amendment claim against Sheehan and Alles. Because Wilson's Fourth Amendment claim against Sheehan and Alles survived summary judgment, the court will set up a scheduling conference to discuss next steps.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 79) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that defendants Anne Portnoy, Fawn Schwandt, Warren Allen, Paul Bjorkquist, Rodolfo Alvarado, and Christopher Schlachter are **DISMISSED**.

**IT IS FURTHER ORDERED** that a telephonic status conference be scheduled to discuss next steps.

Dated at Milwaukee, Wisconsin this 11th day of August, 2022.

BY THE COURT

WILLIAM E. DUFFIN
United States Magistrate Judge